UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| SANDY J. STAHLY,<br><br>      Plaintiff,<br><br>      v.<br><br>SOUTH BEND PUBLIC<br>TRANSPORTATION CORPORATION,<br><br>      Defendant. | Civil Action No. 3:10-CV-257-JVB |

**OPINION AND ORDER**

The Motion for Summary Judgment by South Bend Public Transportation Corporation ("Transpo") on all of Sandy Stahly's claims for employment discrimination and violations of the Americans with Disabilities Act ("ADA") will be denied, because Transpo has failed to show that it prevails as a matter of law. Stahly's motion to strike an affidavit submitted by Transpo in support of its reply brief, or for leave to file a sur-response, will also be denied.

**A. BACKGROUND**

Transpo is a public-transportation corporation serving the South Bend and Mishawaka area, and Sandy Stahly was one of its bus drivers. She began in June 1998; Transpo terminated her employment on August 24, 2009.

Stahly is suing under Title VII of the Civil Rights Act of 1964 for discrimination based on race and sex and for retaliatory termination. (Compl., DE 1.) She also alleges

Transpo discriminated against her on the basis of a perceived disability, in violation of the ADA. (*Id.*) Stahly further claims that Transpo's mandatory medication-disclosure policy violated the ADA. (*Id.*) Transpo's theory of the case focuses on misconduct by Stahly over the two years immediately before her firing.

On July 23, 2007, Stahly received an "instructional reminder stating that she did not have authority to cut a route short without permission from a supervisor." (Br. Supp. Mot. Summ. J., DE 38, at 3. (Transpo's brief does not assert Stahly actually had cut a route short around that time; only that it had reminded her not to do so.))

On September 29 and November 1, 2007, Transpo disciplined Stahly for two separate deviations from her route instructions. On March 7 of the following year, Stahly again disobeyed her route instructions and neglected to call her supervisor when she was supposed to. Stahly was suspended for one day in response.

Transpo next punished Stahly on August 4, 2008, this time with a four-day suspension. Stahly also received three "write-ups"—for violating route instructions, failing to report to a supervisor that she was off route, and failing to report a medication.

The following fall and winter passed, apparently without incident. But on April 9, 2009, Transpo wrote up and suspended Stahly for going off route and not notifying her supervisor. According to Transpo, it was Stahly's fifth route violation since July 23, 2007, and an offense for which she could have been fired. (*Id.* at 5.)

Instead of firing her, Transpo required her to enter into a so-called last-chance agreement with Transpo and Stahly's union, and they did so on April 14, 2009. Transpo explains that it uses last-chance agreements "in an effort to give longer tenured employees such as Stahly an additional chance to keep their jobs." (*Id.*)

Stahly's agreement recited as a fact that she was "a ten-year tenured employee whose [then-]current safety and driving record contain[ed] one (1) Safety Violations [*sic*] and one (1) Preventable Accident along with six (6) Route Driving Violations." (DE 44-2 at 2.) The agreement specified, among others, the following sufficient conditions for discharging Stahly:

- "Any failure to properly and timely report being off-route e.g. upon first notice of being off route [and]
- "Any failure to follow paddle[1] e.g. not following the prescribed route."

(*Id.*) Stahly further agreed she would receive a "disciplinary suspension" from April 10, 2009 to April 14, 2009. (*Id.*) At her deposition, Stahly testified she did not believe she was required to enter into the last-chance agreement because of her race, sex, or possible perceived disability. (Stahly Dep. 363:12–24.)

Stahly contends Transpo came to regard her as disabled as a result of information it collected regarding her medication and a June 2009 anxiety attack. The company required its drivers to allow it to obtain medical information from their treating physicians. Drivers also had to report all the medications they were taking. Transpo explains it collected this information to ensure employees' medications would not impair their driving or other performance. (Stahly made reports pursuant to the policy on June 25, 2009; April 21, 2009; August 1, 2008; February 4, 2008; and April 13, 2006.) In this way, Maurice Pearl, Transpo's director of operations, learned of Stahly's medications. He also knew she had been admitted to the emergency room for the anxiety attack, and that

---

[1] Transpo explains a "paddle" is a document containing instructions to drivers about "times they need to be certain places, what trip they need to be on as well as other route points that they need to adhere to. Not following paddle means that the operator either missed the time points described in the paddle or missed a trip described in the paddle." (DE 38 at 4.)

3

she took medical leave that month. Stahly advised Transpo she had been diagnosed with an anxiety disorder and insomnia.

In fall 2009, Transpo reallocated bus routes between its drivers, and Stahly received her choice of what she believed would be the same set of routes she already had. (DE 38 at 89.) (Her previous set of routes was called Run 39; she was reassigned to Run 60. (*Id.* at 8.)) Stahly's deposition testimony is that Transpo informed her the runs were the same. But although Runs 39 and 60 contained many of the same routes, they were not identical. So when Stahly resumed driving after the reassignment, she eventually failed to drive a route that was her responsibility. Transpo fired her, citing violation of the last-chance agreement. (*Id.* at 12.)

Stahly was not the first Transpo bus driver to violate her route duties or enter into a last-chance agreement. She has identified five other Transpo drivers pertinent to this Order. These drivers are men, not white, and apparently not disabled or perceived as disabled. (*See* Reply Br., DE 47 (no challenge to comparability on any of these bases).) None was fired, and they were subject to comparable supervisors. (*See id.* (unchallenged).) The following table summarizes some of their most significant workplace infractions and discipline, as described by Transpo's log. (DE 45-1.)

|  | Ruben Gonzalez | Curtis Hardy | Eureka Jackson | Al Ward | Aaron White |
|---|---|---|---|---|---|
| Route Violations | Five (Aug. 7, 2008; Feb. 3, 2009; Mar. 4, 2009; Mar. 11, 2009; Aug. 28, 2009) | Seven (May 20, 1999; Aug. 28, 2002; Sep. 18, 2002; Dec. 11, 2002; Dec. 12, 2002; Oct. 23, 2006; Nov. 2, 2006) | Six (Aug. 23, 2005; Aug. 1, 2007; Oct. 16, 2008; Aug. 5, 2009; Aug. 17, 2011; Dec. 20, 2011) | Eight (July 19, 2000; Aug. 7, 2000; May 9, 2001; Aug. 28, 2002; Aug. 29, 2002; July 29, 2003; Nov. 28, 2008; May 3, 2011) | Eight (Feb. 22, 2000; Apr. 21, 2000; Aug. 7, 2000; Apr. 21, 2001; Sep. 3, 2007; Jan. 17, 2009; Jan. 26, 2011; Feb. 20, 2011) |
| "Preventable Accidents" | Six (Mar. 24, 2003; May 16, 2003; Nov. 16, 2004; Mar. 23, 2007; Aug. 20, 2008; Dec. 8, 2008) | Three (Feb. 8, 2001; Dec. 3, 2003; Sep. 8, 2004) | Three (Sep. 15, 2005; Oct. 28, 2005; Mar. 17, 2006) | Three (Jan. 3, 2001; Feb. 10, 2006; Apr. 27, 2006) | None |
| Other Notable Incidents of Bad Driving |  |  | Two (Mar. 13, 2010; Sep. 14, 2011) | Two (Feb. 7, 2003; July 21, 2005) | Nine (Feb. 25, 2003; Apr. 9, 2004; July 21, 2005; May 4, 2006; Dec. 15, 2006; Jan. 12, 2007; Mar. 23, 2007; Aug. 28, 2008; Apr. 21, 2010) |
| Last-Chance Agreement | None | Oct. 1, 2004 | None | None | Sep. 2, 2008 |

Transpo also submits for the Court's consideration an affidavit from Rhonda Jordan, and White's and Hardy's last-chance agreements. (Jordan's affidavit serves merely to authenticate the last-chance agreements.) Stahly objects that Transpo withheld these during discovery. (DE 48.) Transpo counters, representing Stahly's response brief was its first notice that she would be relying on White and Hardy as comparators. (DE 49.) For that reason, and because considering the last-chance agreements and affidavit did not convince the Court to grant the Motion for Summary Judgment anyway, the Court will deny Stahly's motion.

5

**B. SUMMARY-JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party fails to make that showing, the motion may be denied. *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) ("[T]he moving party has the burden of demonstrating that there are no genuine questions of material fact and that he is entitled to judgment as a matter of law." (citing Fed. R. Civ. P. 56 (c))). A motion for summary judgment is not an occasion for weighing evidence, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), though "a factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir.2009), *quoted in Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011).

**C. ANALYSIS**

*1. Discriminatory or Retaliatory Adverse Employment Action*

Transpo claims Stahly cannot raise a triable issue of discrimination or retaliation through the indirect method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), because she did not identify similarly situated comparator employees who received better treatment and do not share her protected traits.[2]

---

[2] Transpo makes the same summary-judgment arguments against Stahly's discrimination and retaliation claims. (DE 38 at 22; *see also* Reply Br., DE 47 (no mention of the retaliation cause of action).) As to both, Transpo overlooks that the *Mc Donnell Douglas* prima facie prongs of satisfactory performance and similarly-situated, better-treated comparators merge in cases involving alleged discriminatory or retaliatory discipline. *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 830–31 (7th Cir. 2007). As a result, there is no occasion to assess whether Stahly was doing a satisfactory job as a stand-alone component of the *McDonnell Douglas* analysis.

Stahly counters that each of Gonzalez, Hardy, Jackson, Ward, and White fits this description. These are non-white men with blemished work records whom Transpo apparently did not regard as disabled, and whom it did not fire. (Transpo has not claimed any of these men is distinguishable for not sharing a common supervisor with Stahly.)

Transpo's view of the histories of the prospective comparators focuses strenuously on last-chance agreements. Its approach, however, is narrower and more rigid than the one adopted by our appellate circuit:

> There is no precise formula to determine whether an individual is similarly situated to comparators. As a general rule, whether individuals are similarly situated is a factual question for the jury. However, a court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met.

*McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004) (citations omitted); *see also Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) ("[W]e reiterate . . . that the similarly-situated inquiry is flexible, common-sense, and factual."); *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 770 (7th Cir. 1994) ("Plaintiffs are free to compare similar conduct, focusing more on the nature of the misconduct rather than on specific company rules.").

Citing no legal authority, Defendant proceeds to claim "similarly situated employees must . . . have been subject to a last chance agreement" and "for reasons similar to Stahly." (Reply 2.) According to Transpo, this leaves Gonzalez, Jackson[3], and Ward unsuitable for comparison with Stahly; she had a last-chance agreement and they

---

[3] Stahly's brief reflects confusion about whether Jackson entered into a last-chance agreement. (*Compare* Resp. 8 ("Eureka Jackson was required to enter into a Last Chance Agreement" *with* Resp. 18 ("TRANSPO did not require Eureka Jackson to enter into a Last Chance Agreement . . . .").) For now, the Court will assume Jackson was *not* subject to a last-chance agreement, because Transpo's Reply so understood Stahly (Reply 4 (seeking to distinguish White and Hardy; then stating "Stahly identifies three other Transpo employees whom [*sic*] she claims are similarly situated and were not required to enter into last chance agreements")) and the discipline log Stahly submitted does not record a last-chance agreement for him. (DE 45-1 at 5.)

7

did not. Transpo urges further that White and Hardy are incomparable to Stahly because Transpo contends—perhaps not entirely correctly, as discussed further below—that White's and Hardy's last-chance agreements did not forbid the particular transgressions they later committed.

The Court agrees that Stahly's last-chance agreement may help explain why, for example, Transpo terminated Stahly but not Ward even though Ward's record reflects more "preventable accidents" and both were similarly frequent route violators. (Ward had five route violations between July 19, 2000, and August 29, 2002, and later committed three more, most recently on May 3, 2011. Stahly deviated from her route duty five times from September 2007 until April 9, 2009, then signed a last-chance agreement on April 14, 2009, and then apparently violated it on August 17, 2009.) But nothing in the caselaw identified by Transpo suggests a jury would be unreasonable not to view these histories exclusively through the lens of last-chance agreements. Instead, a jury might reasonably infer Transpo treated Ward better. After all, it could infer Ward's record of transgressions is at least as bad as Stahly's, and only she was fired. (The jury might infer simply that Ward should have been subject to a last-chance agreement, too.)

Similarly, Curtis Hardy committed four route violations in a span of fewer than four months ending on December 12, 2002, and his record also shows three preventable accidents, dated February 8, 2001, December 3, 2003, and September 8, 2004. Though Hardy was required to sign a last-chance agreement on October 1, 2004, a jury could reasonably infer that by then his conduct had already become worse than Stahly's was when she was fired. Both tended to stray from their routes with similar frequency, and Stahly caused fewer accidents.

Ruben Gonzalez also arguably received more leniency than Stahly did. Gonzalez committed five route violations over the thirteen months beginning on August 7, 2008. By the end of August 2009, he had also managed to rack up six preventable accidents, three of them close in time to his route violations: March 23, 2007, August 20, 2008, and December 8, 2008.

So it is apparent, even before considering other potential comparators, that Stahly has a prima facie case under *McDonnell Douglas*. This shifts the Court's focus to whether Transpo has shown a legitimate motivation for its actions that is unchallenged by any evidence of pretext. *See United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1265–66 (7th Cir. 1990) ("[I]f [considering pretext] requires weighing . . . the facts in question, summary judgment is inappropriate.").

Transpo's proffered non-discriminatory reason for firing Stahly is that she violated her last-chance agreement. (The same point was also a central component of Transpo's argument that Stahly had no prima facie case.) And there is indeed no dispute that after entering into the last-chance agreement, Stahly failed to drive her prescribed route. So a jury might reasonably accept Transpo's non-discriminatory reason. But there is also evidence from which the jury could reject Transpo's explanation.

After all, White's last-chance agreement, signed September 2, 2008, and effective for the following two years, states that he would be fired for "any safety violation" or "[a]ny documented act of negligence, regardless of the degree of damage caused by such negligence (or in the lack of damage)." (DE 47-1 at 3.) Transpo's discipline log cites White in August 2009 for having a passenger in the front compartment while driving, and

9

stopping too close to a car in front of the bus while at a stop light in April 2010. (DE 45-1 at 7.) So it is anything but clear White adhered to his last-chance agreement.

And evidence that Transpo only selectively enforced its last-chance agreements tends to show pretext. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973) (explaining evidence that an employer treated workers who did not share the plaintiff's characteristics better than the plaintiff, despite comparably serious misconduct, would be "[e]specially relevant" to showing pretext). The Seventh Circuit has likewise interpreted *McDonnell Douglas*. *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) ("[C]an evidence that a similarly situated employee received better treatment serve not only as an element of the plaintiff's prima facie case, but also satisfy the plaintiff's burden to show that the employer's legitimate nondiscriminatory reason for its action was pretextual? . . . [Y]es." (citing *McDonnell Douglas*)).

Thus, there is evidence of pretext to be weighed, which makes the motivation for Transpo's treatment of Stahly a genuine issue of material fact. *See Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 507 (7th Cir. 2010) ("On summary judgment . . . a court may not weigh the evidence, or decide which inferences to draw from the facts." (citing *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Even without White, the evidence of drivers who did not have last-chance agreements, construed in Stahly's favor, supports a reasonable inference that Transpo treated her worse than others outside her protected classes. There is also the question whether Stahly's final route violation resulted from Transpo misinforming her.

### *2. Perceived Disability*

Transpo argues Stahly's regarded-as-disabled claim fails for the additional reason that she lacks evidence it considered her impaired.

In 2009, Stahly was taking medication and suffered an anxiety attack for which she was admitted to an emergency room. Stahly also took leave under the Family and Medical Leave Act that year, and was referred by Transpo's employee assistance program to a stress recovery center. Maurice Pearl, Transpo's director of operations, admits he knew of all of this.

Though that is not necessarily a concession of the ultimate issue per se, the legal basis Transpo has offered for its position consists exclusively of cases that interpreted an earlier, more restrictive ADA standard. *See Steffen v. Donahoe*, 680 F.3d 738, 743–44 (7th Cir. 2012) (explaining that ADA amendments effective January 1, 2009, resulted in a more pro-plaintiff standard); *Snyder v. Livingston*, No. 1:11-CV-77, 2012 WL 1493863 (N.D. Ind. Apr. 27, 2012) (further explanation and authorities). For instance, *Amadio v. Ford Motor Company*, 238 F.3d 919, 925 (7th Cir. 2001), relied on by Transpo, states that a plaintiff must show not only that the employer knew of the impairment, but also that "the employer believed that one or more of the plaintiff's major life activities were substantially limited by the plaintiff's impairment."

In contrast, the amended ADA applicable in this case extends to include those who have become victims of prohibited action "because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." 42 U.S.C. § 12102(3)(A) (emphasis added). The governing

"definition of disability . . . shall be construed in favor of broad coverage."
§ 12102(4)(A).

As a result, Transpo has failed to establish as a matter of law that it did not perceive Stahly as impaired. *See Whiteco Indus.*, 17 F.3d at 201 (moving party's burden to show entitlement to judgment as a matter of law).

### *3. ADA-Prohibited Medical Inquiry*

Transpo also seeks summary judgment on Stahly's claim that Transpo's policy of requiring her to disclose all her medications violated the ADA's proscription of certain inquiries of employees about disabilities. *See* 42 U.S.C. § 12112(d)(4)(A) (prohibiting examinations and inquiries described there). Transpo argues its inquiries were job-related and consistent with business necessity as a matter of law.

Neither party has identified a case that allocates the burden of showing the existence or absence of business necessity. And in its own research, this Court did not discover a decision of the Supreme Court or United States Court of Appeals for the Seventh Circuit directly addressing the issue. It is instructive, however, that the Second and Ninth Circuits assign the burden of showing the business necessity of a disability inquiry to the employer. *See Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 97–98 (2d Cir. 2003) (agreeing with the Ninth Circuit that the employer must show a covered inquiry is "no broader or more intrusive than necessary"), *cited in Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009).

So it is significant that although business necessity is the only ground Transpo argues on this claim in its opening brief (DE 38 at 23–24), the brief neglects to identify

12

any evidence of business necessity. The first full paragraph on page 13 describes the policy and sets forth its purpose, and the next three paragraphs recount some of the policy's history in practice. Yet none of this speaks to why there was a business necessity for an inquiry of such breadth.

Transpo unsuccessfully attempts to correct the deficiency by citing in its reply brief to Pearl's testimony that the purpose of its policy was to ensure that an employee's medication "would not adversely affect their ability to drive or to perform their duties." (DE 47 at 7–8.) To be sure, some medications might render a person unfit to drive a bus. But naming the purpose of a policy is not the same as proving with evidence that the policy was necessary to achieve the purpose. And the gap between the two is not trivial. *See Conroy*, 333 F.3d at 97–98 (making it the employer's burden to show that an inquiry covered by § 12112(d)(4) is "vital" to the business, and "no broader or more intrusive than necessary"). Transpo's evidence stops far short of foreclosing the possibility that it could have achieved the same degree of safety with a more narrowly tailored inquiry.

Thus, Transpo has failed to establish a right to judgment as a matter of law on Stahly's claim for its mandatory medication-disclosure policy. *See Whiteco Indus.*, 17 F.3d at 201 (explaining the moving party's burden).

**D. CONCLUSION**

Defendant's Motion for Summary Judgment (DE 37) is therefore **DENIED**. Plaintiff's "Motion to Strike Affidavit of Rhonda Jordan and Attached Exhibits Or In the Alternative for Leave to File Sur-Response" (DE 48) is also **DENIED**.

**SO ORDERED** on January 3, 2013.

                                                 s/ Joseph S. Van Bokkelen
                                                JOSEPH S. VAN BOKKELEN
                                                UNITED STATES DISTRICT JUDGE